1          IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

3    UNITED STATES OF AMERICA,

4       vs.
                                    Criminal No. 18-55
5    EMMETT FRESHCORN,
                  Defendant.

6

7        Transcript of Detention Proceedings on Tuesday, April 3,
2018, United States District Court, Pittsburgh, Pennsylvania,
8  before Lisa Pupo Lenihan, District Magistrate Judge.

9

10  APPEARANCES:

11    For the Government:          Timothy Michael Lanni, Esq.
                                   Assistant U.S. Attorney
12                                 400 U.S. Courthouse
                                   700 Grant Street
13                                 Pittsburgh, PA 15219

14

      For the Defendant:           Michael J. DeRiso, Esq.
15                                 DeRISO & DeRISO
                                   1801 Law & Finance Building
16                                 Pittsburgh, PA  15219

17

18

19

20  Court Reporter:               Juliann A. Kienzle, RMR, CRR
                                  5300 U.S. Courthouse
21                                700 Grant Street
                                  Pittsburgh, PA 15219
22                                (412) 261-6122

23

24      Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

25

1  (Proceedings held in open court; Tuesday, April 4, 2018.)

2          THE COURT:  We're here in the matter of the United

3  States of America versus Emmett Freshcorn, case No. 18-55.

4          The government has filed a request for detention.

5          Mr. Lanni, if you're ready to proceed.

6          MR. LANNI:  Yes, Your Honor.

7          At this time the United States would call Bureau of

8  Alcohol, Tobacco, Firearms and Explosives Special Agent

9  William Isbir.

10         Your Honor, I also have a copy of the Rule 16 receipt

11 here.  May I approach, Your Honor?

12         THE COURT:  You may.

13         MR. DeRISO:  May I approach with the arraignment plea,

14 Judge?

15         THE COURT:  Sure.

16         Now that that's all taken care of, Agent, if you want

17 to step forward and state and spell your name, please.

18         THE WITNESS:  William Isbir, I-S-B-I-R.

19    WILLIAM ISBIR, a witness having been duly sworn, testified

20 as follows:

21                      DIRECT EXAMINATION

22 BY MR. LANNI:

23  Q.  Special Agent Isbir, can you tell us by whom you're

24 employed?

25  A.  I'm employed by the Bureau of Alcohol, Tobacco, Firearms

1 and Explosives.

2 Q.  Did you start an investigation into possible suspicious

3 purchases of firearms?

4 A.  Yes, we did.

5 Q.  Approximately when did that start?

6 A.  Approximately started in November of 2017.

7 Q.  How were you alerted to these purchases of firearms?

8 A.  We received a tip from our Crime Gun Intelligence Center

9 stating that a Heather Wolf had purchased roughly five

10 firearms, approximately accounting for 70 percent of her

11 third-quarter earnings during that time frame.  She does not

12 have a concealed weapons to carry permit as well.

13 Q.  Now, because of that, there were certain irregularities

14 and that's why that might have been flagged, correct?

15 A.  Correct.

16 Q.  Did you do any follow-up investigation in regards to those

17 purchases?

18 A.  Yes, we did.

19 Q.  What did you do?

20 A.  My partner, Bob Mensa, and I approached Sportsmen

21 Outfitters, a local FFL in Knox, Pennsylvania.  We requested

22 the 4473 form, an ATF form, and also we requested the sales

23 receipt for the purchase made from the firearms that Ms. Wolf

24 purchased.

25 Q.  Now, first, the 4473 forms, those are a standard ATF form

1  that must be filled out any time an FFL conducts a gun

2  purchase, correct?

3   A.   That is correct.

4   Q.   Now, who filled out the 4473 forms for these five weapons?

5   A.   Ms. Wolf.

6   Q.   Now, you also said that you had an opportunity to get the

7  sales receipt from the purchase of these weapons, correct?

8   A.   That is correct.

9   Q.   This was from Sportsmen Outfitters?

10  A.   Correct.

11  Q.   Who is the sales receipt made out to and signed by?

12  A.   Mr. Emmett Freshcorn.

13          MR. LANNI:  May approach the witness?

14          THE COURT:  You may.

15 BY MR. LANNI:

16  Q.   I'm going to show you what is previously marked as

17 Government's Exhibit 1.

18          Do you recognize what Government's Exhibit 1 is?

19  A.   Yes.

20  Q.   What is that?

21  A.   That's the sales receipt from Sportsmen Outfitters.

22  Q.   There's a signature on there, correct?

23  A.   Correct.

24  Q.   Then there's actually a typed out name underneath it.

25          What does it say?

```
 1  A.  It says Emmett Freshcorn.

 2  Q.  How much was this purchased for?

 3  A.  $5,530.59.

 4        MR. LANNI:  Your Honor, I ask that Government's

 5  Exhibit 1 that has previously been marked be admitted into

 6  evidence.

 7        THE COURT:  Do you have that?

 8        MR. DeRISO:  I've seen it.  No objection, Judge.

 9        THE COURT:  Exhibit 1 is admitted.

10  BY MR. LANNI:

11  Q.  Now, for those purchases, what type of weapons were

12  actually bought by Ms. Wolf?

13  A.  During the time of that purchase, five handgun firearms

14  were purchased.

15  Q.  What style were those handguns?

16  A.  Various styles, a .22 caliber Ruger, two 5.56 caliber

17  pistols, which are larger ammunition style pistols, and two

18  other handguns, I believe a .40 caliber.

19  Q.  Was there anything like an AR type pistol purchased in

20  this?

21  A.  Those would be the AR style pistols, the 5.56 calibers.

22  Q.  Could you explain what an AR style pistol is?

23  A.  It's a smaller version of an AR style rifle with the stock

24  or the rear of the weapon modified so that it fits either over

25  the forearm or in the palm of the hand and it still fires the
```

1  same round as the AR style rifle.

2  Q.  The AR style rifle would be termed as a high velocity

3  rifle, correct?

4  A.  Correct.

5  Q.  An AR style pistol can be strapped to the arm and used in

6  the same way?

7  A.  Correct.

8  Q.  Now, after you learned this information, you actually went

9  to Sportsmen Outfitters, correct?

10  A.  Correct.

11  Q.  This is when you received the 4473 and that sales receipt

12  which has been marked as Government's Exhibit 1, correct?

13  A.  Correct.

14  Q.  What other investigation did you do at Sportsmen

15  Outfitters in regard to that purchase?

16  A.  Also in relation to that purchase, we spoke with all of

17  the salesclerks who conducted the sale and they described that

18  Ms. Wolf actually selected one of the firearms, but

19  Mr. Freshcorn proceeded around the store and selected four of

20  the other firearms to be purchased at that time.

21  Q.  When you say "selected," what did he actually do?

22  A.  He picked them out, manipulated them, eyed them up,

23  brought them to the front of the counter or asked the

24  salesclerks to allow him to use them or manipulate them in the

25  store.

```
 1  Q.  Then he paid for them?

 2  A.  Correct.

 3  Q.  But Heather Wolf paid for the -- actually filled out the

 4  forms, correct?

 5  A.  She filled out the form.

 6  Q.  Do you know anything about the relation between

 7  Mr. Freshcorn and Ms. Wolf?

 8  A.  I believe they dated at one point.

 9  Q.  They have a child in common?

10  A.  They do.

11  Q.  Now, these four weapons, including the two AR-style

12  pistols, did you have an opportunity to recover these or did

13  the ATF have an opportunity to recover these?

14  A.  Yes, they were recovered.

15  Q.  Where were they recovered from?

16  A.  324 Washington Avenue, Oil City, Pennsylvania.

17  Q.  We'll talk a little bit about that search warrant later.

18            Now, was the fifth pistol ever recovered?

19  A.  It has not been.

20  Q.  Now, based on this, you continued to investigate other

21  purchases that might have occurred at this location and others,

22  correct?

23  A.  Correct.

24  Q.  What was the next purchase that you investigated?

25  A.  The next purchase that we began to investigate was the
```

1  purchase of a .50 caliber Armalite Bolt-Action sniper rifle

2  from Maurer's Trading Post.

3  Q.   Approximately when was that purchased?

4  A.   That was purchased early September of 2017.

5  Q.   What is unusual about a .50 caliber weapon of any sort?

6  A.   Its size, for starters, it has very limited uses and it's

7  a large, large weapon.

8  Q.   When you say "limited uses," what is it used for?

9  A.   It doesn't have any practical everyday uses.  It's used by

10 the military for long-range sniper operations.  It's used to

11 shoot down helicopters, disable tanks, things of that nature.

12 Q.   What is the range for this .50 caliber BMG weapon?

13 A.   It could be anything from 100 yards up to 3,000 yards,

14 depending on other variables, it can be even farther than that.

15 Q.   Now, the shell that goes into this or the bullet,

16 approximately how long or how big is that?

17 A.   Roughly 8 inches.

18 Q.   Now, if you were shooting at a regular target based on the

19 size and velocity of this weapon, what would happen with it?

20 A.   It would basically eviscerate the target.

21 Q.   This is at Maurer's Trading Post, correct?

22 A.   That is correct.

23 Q.   Approximately how long is this weapon?

24 A.   Approximately 5 feet long.

25 Q.   Now, this was displayed prominently at the store, correct?

1  A.  Correct.

2  Q.  The owner actually took a picture of it, correct?

3  A.  Correct.

4  Q.  I'm going to show you --

5          MR. LANNI:  Your Honor, may I approach the witness?

6          THE COURT:  Yes.

7  BY MR. LANNI:

8  Q.  I'm going to show you what has been previously marked as

9  Government's Exhibit No. 2.

10          What is Government's Exhibit No. 2?

11  A.  It is a picture of the .50 caliber Bolt-Action sniper

12  rifle with a gentleman behind it giving thumbs up.

13  Q.  Where is that picture from?

14  A.  It's taken at Maurer's Trading Post.

15  Q.  That .50 caliber weapon, that's not just any .50 caliber,

16  correct?

17  A.  No, that's the one purchased at the time by Mr. McNaughton

18  -- I'm sorry, paid for Mr. Freshcorn, the paperwork filled out

19  by Mr. McNaughton.

20  Q.  The individual with the thumbs up behind it is who?

21  A.  Casey McNaughton.

22  Q.  Now, this .50 caliber that is pictured here would later be

23  recovered; correct?

24  A.  That's correct.

25  Q.  Where was it recovered?

A.   324 Washington Avenue.

        MR. LANNI:  Your Honor, I ask that Government's Exhibit No. 3 be admitted into evidence at this time.

        MR. DeRISO:  No objection.

        THE COURT:  Three is admitted.

BY MR. LANNI:

Q.   I'm also going to show you what has been previously marked as Government's Exhibit No. 2.

        What is this a picture of?

A.   This is a picture of one of Casey McNaughton's relatives holding the same .50 caliber sniper rifle in front of the address 1754 Camp Coffman Road.

        MR. LANNI:  I ask Government's Exhibit No. 2 be placed into evidence.

        MR. DeRISO:  No objection.

        THE COURT:  No.2 is admitted.

BY MR. LANNI:

Q.   Now, this weapon was purchased on that date, correct?

A.   Correct.

Q.   Can you describe -- now you also pulled the 4473 form for that, correct?

A.   Correct.

Q.   Casey McNaughton is listed as the bona fide purchaser, correct?

A.   Correct.

1  Q.  However, you also pulled the sales receipt, correct?

2  A.  Correct.

3  Q.  Who is listed as the purchaser on the receipt?

4  A.  Emmett Freshcorn.

5         MR. LANNI:  Your Honor, may I approach?

6         THE COURT:  Yes.

7  BY MR. LANNI:

8  Q.  Let me show you what has been previously marked as

9  Government's Exhibit No. 4.

10        Do you recognize what Government's Exhibit No. 4 is?

11  A.  Yes, this is a receipt from Maurer's Trading Post.

12  Q.  What is the amount on there?

13  A.  $4,037.94.

14  Q.  That's a pretty expensive weapon I would say, right?

15  A.  Correct.

16  Q.  Who does it say the purchaser on there is?

17  A.  Emmett Freshcorn.

18        MR. LANNI:  Your Honor, I ask Government's Exhibit No.

19  4 be placed into evidence.

20        MR. DeRISO:  No objection.

21        THE COURT:  No. 4 is admitted.

22  BY MR. LANNI:

23  Q.  Now, as part of your follow-up investigation into that,

24  what was described about the purchase that took place from

25  individuals that you spoke to there?

A.   When we is interviewed the salesperson from Maurer's
Trading Post, she stated that Casey McNaughton had filled out
the paperwork, picked out this particular .50 caliber rifle and
his new boss at the time was going to be paying for it.  She
described -- she was not sure who his new boss was, but he was
present at the time of the sale.  And when it came time for the
sales slip to be paid for, Mr. Freshcorn paid the balance using
a debit card.

Q.   Who actually carried the weapon out of the store on that
day?

A.   Mr. Freshcorn.

Q.   Now, this .50 caliber weapon, did you speak with other
witnesses who may have seen or handled this weapon even?

A.   Yes.

Q.   Without identifying who this individual is, what did
Mr. Freshcorn do with that weapon in terms of that individual?

A.   At one point in time, Mr. Freshcorn gave this particular
.50 caliber weapon to a neighbor in his neighborhood to hold
for him while other court proceedings were taking place.  He
returned to retrieve this weapon after those legal matters were
handled.

Q.   Now, Mr. Freshcorn because of a previous conviction in
Pennsylvania state court cannot have any weapons at all,
correct?

A.   That is correct.

1  Q.  Now, you continued doing investigation into more possible

2  straw purchases, correct?

3  A.  That is correct.

4  Q.  Now, you learned of one possibly in December of 2017,

5  correct?

6  A.  I believe it was November, but yes.

7  Q.  This is one where Mr. Freshcorn and an individual named

8  Mr. Austin Strotman?

9  A.  Yes, that is December.

10  Q.  Where was the location for this?

11  A.  That was Sportsmen Outfitters.

12  Q.  This is the same location where Heather Wolf went to buy

13  the weapons?

14  A.  Correct.

15  Q.  Now, Mr. Freshcorn and Mr. Strotman walked in, now, what

16  was Mr. Freshcorn carrying?

17  A.  Mr. Freshcorn was carrying the .50 caliber rifle.

18  Q.  That was the weapon pictured in Government's Exhibits 2

19  and 3?

20  A.  That is correct.

21  Q.  Were there any other weapons -- first off, who was with

22  him?

23  A.  Another unidentified individual at the time, we later

24  determined to be Austin Strotman.

25  Q.  Was Mr. Strotman carrying anything?

1  A.  He was carrying two pistols.

2  Q.  When the individuals Mr. Strotman and Mr. Freshcorn got

3  into the store, what did Mr. Freshcorn say what he wanted done

4  with those three weapons?

5  A.  At the time, Mr. Freshcorn wanted the store to modify or

6  repair the three weapons that he brought in.

7  Q.  Was the store able to do so?

8  A.  They were not.

9  Q.  Why not?

10  A.  That particular store does not employ a gunsmith and they

11  don't do those sort of repairs or alterations.

12  Q.  Now, Mr. Freshcorn, then what did he try to do once he

13  couldn't have the weapons fixed?

14  A.  He wanted to purchase additional weapons at that time.

15  Q.  What was he told about if he were going to buy weapons at

16  that store he had to do?

17  A.  If he were going to buy weapons at that time, that he

18  would have to be the one to fill out the paperwork.

19  Q.  How did Mr. Freshcorn react when he was told that he could

20  not buy weapons without filling out the paperwork?

21  A.  He became very angry with the employees and the staff at

22  Sportsmen Outfitters and he stated that he had never had to do

23  that before.

24  Q.  Now, before he left, though, he did buy some things,

25  correct?

1  A.  Correct.

2  Q.  He bought 120 rounds of .50 caliber ammunition, correct?

3  A.  Correct.

4  Q.  He bought 100 rounds of .380 caliber ammunition, correct?

5  A.  Correct.

6  Q.  Some type of targets or what were those?

7  A.  25 pounds of bullseye exploding targets.

8  Q.  Now, when Mr. Strotman and Mr. Freshcorn left, how did

9  they bring those items out of the store?

10 A.  Mr. Freshcorn carried the .50 caliber rifle and

11 Mr. Strotman carried the two pistols.

12 Q.  Now, in terms of Mr. Freshcorn's weapons possession, was

13 there a time when an individual in the neighborhood went to see

14 Mr. Freshcorn at 324 Washington Avenue, correct?

15 A.  Yes, correct.

16 Q.  When he or she approached Mr. Freshcorn, what did

17 Mr. Freshcorn do or what gestures did he make?

18 A.  He made a boasting gesture and raised his shirt up to

19 indicate that he had a pistol on his waistband.

20 Q.  Now, this individual also had an opportunity to look

21 inside of 324 Washington Avenue, correct?

22 A.  Correct.

23 Q.  What did that individual observe inside 324 Washington

24 Avenue?

25 A.  The individual observed all the occupants smoking

marijuana. On one of the tables inside the residence, they
observed a black box, which appeared to be a pistol magazine
inside of it, and also plastic bags with a white residue in
them, which from his knowledge, he believed to be cocaine.

Q. Now, you also learned about Mr. Freshcorn's pending
charges in other jurisdictions, correct?

A. Correct.

Q. You learned about a pending felony case now which he's
pled guilty to in Nebraska, correct?

A. Correct.

Q. What were the facts and circumstances about that case?

A. Mr. Freshcorn was taking a road trip with two other
friends, they were stopped in a traffic stop and throughout the
course of the traffic stop, roughly 5 grams of heroin were
recovered, along with other drug paraphernalia, LSD, and some
marijuana.

Q. Who were the two friends that were in the car with him?

A. Autumn Dolby and Casey McNaughton.

Q. The same Casey McNaughton that was around as his employee?

A. Correct.

Q. And Autumn Lee Dolby, who is she?

A. His girlfriend.

Q. Did you have the chance to investigate weapon purchases
made by Ms. Dolby?

A. Yes.

1  Q.  Now, when did she make any weapons purchases in the State

2  of Pennsylvania?

3  A.  We confirmed she has made two weapons purchases, one in

4  April of 2017 and one in November of 2017.

5  Q.  What were those for?

6  A.  The first purchase in April was for a single pistol.  The

7  purchase in November were for a pistol and AK rifle.

8  Q.  AK rifle?

9  A.  Correct.

10  Q.  Now, did you do any follow-up investigation on who

11  actually paid for those or anything like that?

12  A.  Yes, we did.

13  Q.  Who was it?

14  A.  That was Emmett Freshcorn.

15  Q.  Additionally, Mr. Freshcorn, you got to learn a little bit

16  about his life and facts and circumstances of his life

17  throughout the investigation, correct?

18  A.  Correct.

19  Q.  Recently he acquired or inherited a large sum of money,

20  correct?

21  A.  Correct.

22  Q.  As a result of that was able to buy numerous vehicles,

23  correct?

24  A.  Correct.

25  Q.  One of those was an Acura SUV?

A.  Correct.

Q.  Now, at some point that Acura SUV was being driven by
Autumn Lee Dolby and she abandoned it because it was inoperable
at some point.

A.  Correct.

Q.  It was towed to the PSP barracks in I believe Clarion, PA?

A.  Correct.

Q.  Now, when the officers towed it and before they even
started an inventory search, they looked in and what did they
see in the car?

A.  They saw two AK-style magazines with rounds inside of
them.

Q.  When, Mr. Freshcorn -- we'll go a little bit further in
the future.

In March of this year, there were numerous ATF and
PSP, meaning Pennsylvania State Police search warrants executed
at locations in Venango and Clarion County, correct?

A.  Correct.

Q.  One of those was 1754 Camp Coffman Road; correct?

A.  That's correct.

Q.  That's the location at which Mr. McNaughton's relative was
holding that large weapon, correct?

A.  Correct.

Q.  What was recovered at 1754 Camp Coffman Road?

A.  Various rounds of ammunition.

1  Q.  Can you detail what types of ammunition?

2  A.  Yes.  There was a wide variety.  There were two different

3  kinds of shotgun shells, 20 gauge and 12 gauge, pistol

4  ammunition to include a .40 caliber, .380 caliber, .22 and .40

5  caliber, along with a spent shell casing for a .50 caliber BMG.

6  Q.  You also searched 324 Washington Road in Oil City,

7  correct?

8  A.  Correct.

9  Q.  What was recovered?  First off, who was home at that

10  location?

11  A.  Autumn Dolby and Marta Vasquez.

12  Q.  Who is Marta Vasquez?

13  A.  Mr. Freshcorn's mother.

14  Q.  What was recovered at this location?

15  A.  Thirteen firearms were recovered at the location, along

16  with various ammunition and some drug paraphernalia.

17  Q.  The 13 firearms, where were they placed, actually?

18  A.  Ten of the 13 were placed in a truck lockbox in the

19  entryway of the residence, two were found in a vehicle outside

20  of the residence, and one in the bedroom of the residence.

21  Q.  Now, some of those weapons were registered to Ms. Wolf,

22  correct?

23  A.  Correct.

24  Q.  Some of them were registered to Mr. McNaughton, correct?

25  A.  Correct.

1  Q.  Some were registered to Ms. Autumn Lee Dolby, correct?

2  A.  Correct.

3  Q.  Ms. Dolby was there at the time?

4  A.  Correct.

5  Q.  Since the weapons were registered to her, you had an

6  opportunity to speak with her about those weapons?

7  A.  Correct.

8  Q.  What type of questions did you ask her about those

9  weapons?

10  A.  We just asked her general firearms questions, what kind of

11  weapon it was, what was the caliber, just the general makeup,

12  the color, the style, whether it be a pistol, revolver, rifle

13  or shotgun?

14  Q.  What answers did Ms. Dolby have for you?

15  A.  She did not provide us with a lot of information.  She did

16  not know the caliber or make of a lot of the firearms.

17  Q.  Did she know where the firearms were even stored?

18  A.  No.

19  Q.  Now, you also searched Casey McNaughton's home, correct?

20  A.  Correct.

21  Q.  Where was that, 406 Hoffman Road?

22  A.  Correct.

23  Q.  Were any of the weapons that he purchased there?

24  A.  No.

25  Q.  Was there any ammunition there?

1  A.  No.

2  Q.  Did you recover a weapon from there, though?

3  A.  Yes.

4  Q.  What type of weapon was that?

5  A.  That was a .22 caliber rifle.

6  Q.  That came to him in which way he told you?

7  A.  He inherited it from either his grandfather or father.

8  Q.  Did you find any other types of incriminating information

9  or items at Mr. McNaughton's home?

10  A.  No.

11  Q.  Was there any drug paraphernalia found?

12  A.  There was drug paraphernalia found.

13  Q.  While these search warrants were taking place, this was

14  after an indictment was returned against Mr. Freshcorn,

15  correct?

16  A.  Correct.

17  Q.  Mr. Freshcorn was not found at any of these locations?

18  A.  He was not.

19  Q.  However, later, members of ATF did locate Mr. Freshcorn,

20  correct?

21  A.  That is correct.

22  Q.  Where was he found?

23  A.  He was located at the Hyatt House in Pittsburgh,

24  Pennsylvania.

25  Q.  That's approximately in the Bloomfield region of the City

1  of Pittsburgh, correct?

2  A.  Yes, sir.

3  Q.  Now, when he was discovered, he was driving what vehicle?

4  A.  A red Corvette.

5  Q.  What was found inside the red Corvette?

6  A.  An AR-style magazine loaded with ammunition, and also

7  drugs and drug paraphernalia.

8  Q.  Mr. Freshcorn was cooperative, correct?

9  A.  Correct.

10  Q.  He indicated that he was able to do what at that time?

11  A.  Purchase additional drugs.

12  Q.  Why is that?

13  A.  Because he frequently uses drugs on a regular basis.

14        MR. LANNI:  I have no further questions for Mr. Isbir.

15        THE COURT:  Cross.

16        MR. DeRISO:  Thank you.

17                    CROSS-EXAMINATION

18  BY MR. DeRISO:

19  Q.  Good afternoon, Agent.

20  A.  Hello, sir.

21  Q.  Your investigation began with Mr. Freshcorn because of a

22  gun shop noting some irregularities in purchases, is that

23  correct?

24  A.  The irregularities were noted by our Crime Gun Center.

25  Q.  It wasn't because anybody in Oil City reported

1  Mr. Freshcorn acting crazy or dangerous with weapons?

2  A.  No, sir.

3  Q.  Through your investigation, other than this confidential

4  source which claimed to you that at some point in the past

5  Mr. Freshcorn made a gesture to his front shirt gesturing that

6  maybe he had a firearm, other than that, and your investigation

7  over the past year, no one had come forward and said

8  Mr. Freshcorn was acting dangerous or crazy with guns and

9  threatening them, correct?

10  A.  No, that's actually incorrect.

11  Q.  There was a witness?

12  A.  Yes, sir.

13  Q.  Who would that be?

14          MR. LANNI:  Your Honor, I object to identifying who

15  the witness is at this point.  I don't think it's -- he can ask

16  him about the content of what he said, but I don't think

17  there's any pretrial rule, especially at a detention hearing to

18  disclose a witness at this time.

19          THE COURT:  Let's ask him what the witness said, then

20  we'll decide.

21  BY MR. DeRISO:

22  Q.  Is this the confidential source named in your search

23  warrant?

24  A.  This is a different event.

25  Q.  Different event, same source?

A.  No, incorrect.

Q.  What did this individual tell you about Mr. Freshcorn?

A.  Once Mr. Freshcorn --

Q.  Date, when did he say it happened?

A.  I don't know an exact date.

Q.  So, he told you about an incident but was unable to date it?

A.  I have the date, I just don't know off the top of my head.

Q.  Was it in the past year?

A.  Yes.

Q.  Can you tell us about the incident?

A.  Yes, absolutely.  It was when he was denied the purchasing of the firearms at Sportsmen Outfitters, he was -- when he became irate and angry, he left the store and several customers in the store asked the salesclerk to lock the door after he left for fear that he would return.

Q.  So the incident that you told the Court about is the incident that you are speaking of now?

A.  Correct.

Q.  So, other than that, you had no one saying he was acting with a firearm, since he purchased these firearms, he wasn't toting the firearms around town acting irresponsible?

A.  Just the one time.

Q.  Even that one, there was no firearm shown, he acted as if he had one?

1  A.  No, the firearm was visibly seen.

2  Q.  That's what your source says?

3  A.  Yes, sir.

4  Q.  So prior to Mr. Freshcorn's conviction in August of 2017,

5  which the allegation is that is what made him ineligible to

6  purchase firearms in the fall of 2017, correct?

7  A.  Correct.

8  Q.  Around that time?

9  A.  Around that time, yes.

10  Q.  Prior to that, early in 2017, he was legal to purchase

11  firearms, correct?

12  A.  No, that is incorrect.  He was prohibited for -- he had a

13  prohibited offensive weapons charge in 2009, I believe.

14  Q.  Was that 2009?

15  A.  I believe so.

16  Q.  That was the one in Clarion County?

17  A.  Yes.

18  Q.  So from 2009, that was the simple assault, prohibitive

19  offensive weapon when he was 21?

20  A.  Correct.

21  Q.  From that point forward, it was the allegation that he was

22  not permitted to obtain weapons?

23  A.  Correct.

24  Q.  The information you received regarding Mr. Freshcorn, a

25  lot of your investigation focused on the past eight months,

1  correct?

2  A.   Correct.

3  Q.   That's where a lot of this or all of the activity that is

4  concerning took place over the past eight months, correct?

5  A.   Correct.

6  Q.   Through your investigation, you learned that

7  Mr. Freshcorn's father passed in February '17?

8  A.   Correct.

9  Q.   You also learned, as you testified, he came upon a

10 substantial amount of finances?

11 A.   That is correct.

12 Q.   The individuals who were charged with helping

13 Mr. Freshcorn with the estate, through your investigation, you

14 determined that he was basically given approximately three

15 quarters of a million dollars?

16 A.   Approximately.

17 Q.   Through your investigation, you determined Mr. Freshcorn's

18 drug use exponentially increased?

19 A.   Yes, sir.

20 Q.   His drug of choice, was it a mixture of things, or was it

21 heroin?

22 A.   Mixture of things.

23 Q.   So, when he was in Nebraska and he was pulled over, the

24 weight he was caught with wasn't an extraordinarily large

25 amount of weight coming back with him, agreed?

1  A.  I can't speak on what is extraordinary and what is not.

2  Q.  You're DEA -- you're ATF, right?

3  A.  Yes, sir.

4  Q.  So five grams of heroin would you consider an

5  extraordinary amount of weight?

6  A.  Depends on your personal usage.

7  Q.  So when he was caught, he was caught with about 100 bags,

8  right?

9  A.  I don't believe that's accurate.

10  Q.  How much was on his person?

11  A.  I believe it was 50 bags.

12  Q.  So he had 50 bags of heroin on his person.  You don't know

13  how those are weighted out, do you?

14  A.  I do not.

15  Q.  When he was in Nebraska, there were no firearms, correct?

16  A.  Correct.

17  Q.  So he traveled across the state in a vehicle, was coming

18  back, he pled guilty, so there were narcotics in the vehicle

19  and there were no firearms, correct?

20  A.  Correct.

21  Q.  Also during your investigation, you had occasion to look

22  at his properties?

23  A.  Yes, sir.

24  Q.  When you were looking at his properties, did you notice

25  the sandbags in the area in which the what appeared to be -- I

1 don't want to say shooting range, but it was clear that

2 firearms were being shot back there?

3 A.  I did not notice personally any sandbags, but there were

4 shell casings.

5 Q.  Mr. Smith will testify, but there were sandbags and

6 targets and things of that nature in the one central area?

7 A.  Again, I did not notice those myself.

8 Q.  The items he purchased, the exploding targets, obviously,

9 that would be consistent with someone who is using various high

10 velocity firearms to shoot the targets, correct?

11 A.  That is correct.

12 Q.  Because those targets typically won't explode with a .22

13 or a .380, correct?

14 A.  Correct.

15 Q.  When you arrested, when you took Mr. Freshcorn into

16 custody at the Pittsburgh Hyatt, he was visibly under the

17 influence of narcotics?

18 A.  I was not present at the time, but as I was told, yes.

19 Q.  He was cooperative?

20 A.  Yes.

21 Q.  There were no firearms on his person, correct?

22 A.  Correct.

23 Q.  The magazine of ammunition that was found in his Corvette,

24 was that consistent to be used with one of the firearms that

25 was back in Oil City?

A.   It was.

Q.   The question Mr. Lanni asked you about Mr. Freshcorn, upon being taken into custody, he attempted to help federal agents through cooperation, correct?

A.   Correct.

Q.   That interested you, the agents, and they helped facilitate certain communications with certain other actors, correct?

A.   That is correct.

Q.   The firearms, they were found locked in a box -- that's a nursery rhyme somewhere -- locked in a box, they were locked in a box at his residence, correct?

A.   The majority of them.

Q.   One was in the bedroom and two were found in a vehicle?

A.   That is correct.

Q.   Were any of them loaded?

A.   Not to my knowledge.

Q.   The ammunition was kept in a separate place, correct?

A.   Yes, sir.

Q.   So, if someone wanted to use that gun, they would have had to unlock the box, find the ammunition, put in a magazine, which was located in a separate facility or separate location, and then load the firearm?

A.   That's correct.

Q.   That's accurate?

1          There's no evidence that Mr. Freshcorn was reselling

2  the firearms, correct?

3  A.  Correct.

4  Q.  There's no evidence that he was trading firearms for

5  drugs, correct?

6  A.  Correct.

7  Q.  Outside of the one firearm, which you know where it is,

8  correct?

9  A.  Which --

10  Q.  You said there's one firearm that wasn't recovered?

11  A.  Yes, there were several that were not recovered.

12  Q.  Have you interviewed either your sources or the occupants

13  of the residence to determine the location of those firearms?

14  A.  We have interviewed the occupants of the residence, but

15  not -- one other individual still needs to be interviewed.

16          MR. DeRISO:  May I have one second, Your Honor.

17  BY MR. DeRISO:

18  Q.  The picture you have is of the that McNaughton character

19  .50 the 50 cal?

20  A.  Correct.

21  Q.  The .50 cal, did it jam and need repaired, is that what

22  happened?

23  A.  No, he wanted a new stock provided.

24  Q.  Do your sources indicate who was firing the .50 cal?

25  A.  No.

1  Q.  So, the only evidence you have regarding the .50 cal was

2  the picture of the individual holding the .50 cal and the

3  ammunition that you indicate Mr. Freshcorn purchased, correct?

4  A.  Also, the fact that he had given it to a neighbor,

5  retrieved it, had made modifications to it such as adding a

6  scope, wanting to get the stock repaired.

7  Q.  Shooting it, how about shooting it?

8  A.  Shooting it, we had one person tell us that he had fired

9  the weapon.

10  Q.  That was in his backyard into a tree stump?

11  A.  In his backyard.  It was not specified what he was

12  shooting at.

13  Q.  When you learned it was in his backyard, is that what

14  caused you to go to his backyard and look at his target range?

15  A.  Again, I never saw his target range.

16          MR. DeRISO:  Thank you.

17          That's all I have, Judge.

18          THE COURT:  Mr. Lanni.

19          MR. LANNI:  No redirect.

20          THE COURT:  Agent, how many guns of the guns that you

21  testified about are in the possession of ATF right now?

22          THE WITNESS:  Thirteen.

23          THE COURT:  How many guns are at large, so to speak?

24          THE WITNESS:  Approximately five guns are at large.

25          THE COURT:  Do you have any idea where those guns are?

1        THE WITNESS:  We need to speak with a few other

2 individuals to, hopefully, determine where they may have gone.

3        THE COURT:  But they're not at 324 Washington?

4        THE WITNESS:  No, ma'am.

5        THE COURT:  Thank you.

6        Anything else?

7        MR. LANNI:  I have no follow-up based on that.

8        I have no further witnesses either.

9        THE COURT:  Mr. DeRiso?

10        MR. DeRISO:  I do, Judge.

11              FURTHER CROSS-EXAMINATION

12 BY MR. DeRISO:

13 Q.  Your not locating the firearms does not equate to a

14 concern that they're on the street, a legitimate concern.

15 We're always concerned about that, I'm not being smart, but a

16 legitimate concern, is there a legitimate concern that those

17 firearms are somewhere on the street?

18 A.  Absolutely.

19 Q.  When you spoke to Mr. Freshcorn that evening, didn't he

20 explain to you where some of the other firearms were?

21 A.  Again, I was not there present at his arrest and did not

22 speak to him that night.

23        MR. DeRISO:  Thank you.

24        THE COURT:  Thank you, Agent.  You may step down.

25        Does the defense have any witnesses or evidence to

1 present?

2       MR. DeRISO: We may, Judge. May I have one minute.

3     (Whereupon, there was a brief pause in the proceedings.)

4       MR. DeRISO: Judge, may I have one second with

5 Mr. Lanni.

6       THE COURT: Yes.

7       MR. DeRISO: Judge, can I call Mr. Smith for a quick

8 witness regarding certain evidence at a location?

9       THE COURT: Sure.

10       THE CLERK: Kindly state and spell your full name for

11 the record.

12       THE WITNESS: James M. Smith, S-M-I-T-H

13     JAMES M. SMITH, a witness having been duly sworn,

14 testified as follows:

15                 DIRECT EXAMINATION

16 BY MR. DeRISO:

17 Q. Sir, can you please identify yourself?

18 A. James M. Smith.

19 Q. You were employed by myself in the Freshcorn case?

20 A. Correct.

21 Q. One of the things that we asked you to do was to go to the

22 properties in Oil City and look at the one farm for evidence of

23 a shooting range?

24 A. Sure.

25 Q. Did you do that?

1  A.  I did.

2  Q.  When did you go and what was the location?

3  A.  Friday, March 16th.  The location was 1754 Camp Coffman

4  Road.

5  Q.  It was snowy out that day?

6  A.  It was.

7  Q.  When you went there, can you describe the condition of the

8  property?

9  A.  It's a large farm, a lot of farm equipment around it,

10  several out buildings, a house, several old cars.

11  Q.  I'm going to show you an exhibit collectively we've marked

12  as Defense Exhibit A.

13          Can you please identify those pictures.

14          And let me ask you this.  What were you looking for on

15  this farm?

16  A.  We had conversations with the client.

17  Q.  Without going into what he said, what were you looking for

18  on his farm?

19  A.  We were looking for a shooting range, evidence of

20  shooting, sandbags, targets, the like.

21  Q.  When you got there, did you find evidence of a shooting

22  range?

23  A.  I did.

24  Q.  Those three pictures there, I've showed them to Mr. Lanni,

25  I don't think he's going to object to their admission.

1          MR. LANNI:  No objection.

2   BY MR. DeRISO:

3   Q.  Can you describe what they are?

4   A.  The first picture would show several sandbags that are

5   laying on the ground covered partially in snow near a

6   concrete -- I believe it's a concrete slab of some sort where

7   obviously the sandbags were placed to steady a rifle, firearm.

8          The second photo is a stump that had a target

9   apparently attached to it.  We had to kick around in the snow a

10  little bit to find it, it had either blown off or been taken

11  down.

12  Q.  How far was that from the sandbags?

13  A.  I would say no more than 100 yards which in western

14  Pennsylvania is a typical shooting range, guys that hunt, sight

15  their guns in, that sort of thing.

16  Q.  You're an avid hunter?

17  A.  I am a hunter.

18  Q.  So that is typical?

19  A.  Typical where you'd sight in.

20  Q.  The third picture you have?

21  A.  The third picture is from the sandbags down to the stump,

22  which I would estimate to be approximately 100 yards.

23          MR. DeRISO:  Judge, I'd move these into evidence.

24          THE COURT:  Defense Exhibit A consisting of three

25  photographs is admitted.

1        MR. DeRISO:  I have A1, A2 and A3 consistent with how

2   he testified.

3   BY MR. DeRISO:

4   Q.  Did you find any shell casings?

5   A.  I did.

6   Q.  Was it a variety of shell casings?

7   A.  It was.

8        MR. DeRISO:  That's all I have, Judge.

9        THE COURT:  Any cross?

10       MR. LANNI:  Very briefly.

11                     CROSS-EXAMINATION

12  BY MR. LANNI:

13  Q.  Mr. Smith, you had an opportunity to survey and view the

14  property in the course of this.  In that property, is it close

15  to any houses or anything?

16  A.  There is a house down below it.  If I was facing the

17  house, to my left would be a very large field.  At the house

18  itself, there would be out buildings behind the house.  To the

19  right of the house would be woods.  There is a house down the

20  road some distance, I don't know what that distance is.

21  Q.  This general area out there, it's pretty rural, right?

22  A.  Certainly is.

23  Q.  Are there lights kind of out there?

24  A.  When you say "lights"?

25  Q.  In the area where this was, were there lamp posts,

lighting?

A.   I don't recall that, but I was out there during the
daytime.   I really didn't pay much attention to that.   I knew
what I was there to look for and so that's what I looked at.

Q.   Any roads by there or anything?

A.   There are, there are roads that sit on a crossroad kind
of, yet down below the field.   There are a lot of old roads.

Q.   How far is that, approximately, from the shooting range
that you looked at?

A.   The range was right in the back, backyard.   You could walk
out the back of that house and probably within 50 to 75 yards
be right where that range was.

Q.   Very close to the house?

A.   Very close to the house.

Q.   Let me ask you this.   Were the house, any of the other
buildings, the outhouses below the field, the road, any other
cars, was that within 3,000 yards you would say?

A.   I couldn't tell you that.   But those guns are built
sometimes for competitive shooting and distance.   Typically,
you wouldn't fire that around your house.   Now, you would save
the shells from those because they can be reloaded.   So,
finding a shell there might not mean a discharge at that
location.

Q.   So, we're talking about, you have some experience in
competitive shooting or hunting?

A.  I don't do it, but I have friends who do it.  It's beyond
my comprehension.

Q.  You have some knowledge about it, correct?

A.  Yes.

Q.  May be sharp shooting or things like that?

A.  Uh-huh.

Q.  So .50 caliber, which has a range of 3,000 yards and can
shoot a tank or an aircraft out of the air, would that be used
for competition shooting?

A.  They use those.  Actually, I have friends that own those.

Q.  When they have those types of competitions, do they have
just -- are they by houses?

A.  Not typically.

Q.  They're not, not typically, right.  Are they by roads?

A.  You have to get in, you have to get into the shooting
range, but typically, you have to have a place that has a
lengthy distance to shoot at that distance.

Q.  You also need supervision, right?  You need some type of
people watching this, correct, spotters?

A.  Well, my experience with it is you do need not necessarily
spotters, but it's unusual for one guy to go out there by
himself, load it up and fire at a target that is several
thousand feet away.

Q.  It's unusual, probably not safe?

A.  I wouldn't be qualified to give you an opinion on that.

1          MR. LANNI:  No further questions.

2          MR. DeRISO:  One follow-up, Judge.

3                    REDIRECT EXAMINATION

4  BY MR. DeRISO:

5  Q.  The area where the gun was being fired, it was at a

6  downhill trajectory?

7  A.  It was.

8  Q.  So if target were missed, it would go into a hillside?

9  A.  It should, theoretically.  There were a lot of trees down

10  below that.

11  Q.  So behind the target there was no danger of houses or cars

12  or roads or anything like that?

13  A.  I didn't see anything there that would give me pause if I

14  was sighting a gun on that site.

15          MR. DeRISO:  Thank you.

16          THE COURT:  Mr. Lanni?

17          MR. LANNI:  I have no recross based on that.

18          THE COURT:  Mr. Smith, you're excused.

19          Anything else from the defense.

20          MR. DeRISO:  No, Your Honor.

21          THE COURT:  Mr. Lanni, do you have argument?

22          MR. LANNI:  Yes, Your Honor.

23          Your Honor, I think in this case, not to make a

24  shooting analogy, but a lot of the things missed the mark

25  because what we have here is not about whether or not he was

using this for a shooting range or what he was assembling the
weapons for, that it wasn't used in a crime of violence, it
completely misses the point of the danger to the community, and
I think there are some flight issues that are possibly at risk
here as well, too, based on his erratic nature, drug use.
Means and income also is another possibility. But really, we
have to look at danger here. What the danger is is not just
simply that these types of weapons are actively being used in
crimes of violence or that they're being traded for drugs,
straw purchasing in itself, and this is what we have here in
this case, Your Honor, while the defendant is only charged with
one count of possession and ammunition, the evidence that the
government put forth is really showing that this is a somewhat
fairly large pattern of straw purchasing. Your Honor, what the
problem is with straw purchasing is that we have an entire
regulatory system set up for extremely dangerous weapons. I
don't think anybody, whether you're an avid hunter, whether
you're in the military, denies that these are extremely
dangerous weapons. Any gun is extremely dangerous. But in
this case, we have AR pistols, we have .380 caliber rifles. We
have AK-47s, we have .50 caliber sniper rifles that can shoot a
tank, that can shoot a helicopter. So, whether they're out
there being actively used I think completely misses the mark of
what the real danger is. The danger is that because of
Mr. Freshcorn's instability and his really pathological need to

compile dangerous weapons and ammunition, we have dangerous
weapons and ammunition all across Western Pennsylvania.  There
are weapons that are unaccounted for.  There are weapons that
are in the house.  There are weapons that could be used for
target practice, for shooting.  That's extremely dangerous.  So
I don't think, while this is not a presumption case, the
government, I think, can show that the charges and the nature
of the charges here are extremely dangerous.

        And, Your Honor, the Attorney General just started a
program called try and lie cases.  These are cases that have to
be aggressively prosecuted where people who try to go buy guns
illegally, where they just have the brazen ability to walk up
to a store and buy a gun.  That's exactly what Mr. Freshcorn
did.  He was irate that he could not just go in and buy a
weapon, even though he was prohibited from doing so.  So I
think the fact that these weapons were not used in crimes of
violence or they weren't used in drug trafficking crimes
completely misses the mark as to what the real danger is here
and the real danger Mr. Freshcorn poses, regardless of any
conditions that can be imposed.

        I think we really have to look at Mr. Freshcorn's
history in total to really get to that because, Your Honor,
drug addiction and alcohol, let's not forget about alcohol
abuse and addiction because that's just as bad, those are
really dangers and evils that everybody faces, families face,

different individuals face, and it can be helped and it can be
cured, but Mr. Freshcorn here, I think his violent kind of
tendencies go beyond that.  I mean he is first adjudicated
delinquent at 14 for robbery.  He has two more juvenile
adjudications.  Then he has two DUIs where he has the highest
rate, .16 or above.  Then he has simple assault and the
possessing the weapons that made him ineligible all the way
back in 2009.  Then he has terroristic threats.  Then he has
the felony drug charge in Nebraska where he was driving
cross-country with 5 grams of heroin or fentanyl, from my
estimation that would be more than 50 bags, probably be five
bricks, which would be 250, but that's just an estimate.  LSD.
We also now have a charge and a guilty plea that might have
been changed to cruelty to animals.  Then we have another
charge.  So, we have here, really, a history of danger of
noncompliance, of drug use, of proclivity for weapons and
ammunition.  This is not a Second Amendment debate here, this
is not a Second Amendment argument because Mr. Freshcorn can't
possess weapons.  He can't have any weapons.  He can't have
other people buy weapons for him.

        Your Honor, when we really get down to it of whether
there can be any conditions or combination of conditions that
can be put into place to prevent this behavior and to prevent
who Mr. Freshcorn is, and I think it's way beyond just -- it's
a terrible thing, his father died, he was probably close with

him, but that's not an excuse to illegally buy weapons, buy
drugs, flash weapons at people.  It is simply not an excuse at
all.  Millions of people have their parents die every day, are
affected by loss and they don't act out this way.

Then we have to look at what are the conditions or
combination of conditions that can be used to assure that this
type of behavior can't happen.  There are several troubling
things.  One, Your Honor, is that everyone around Mr. Freshcorn
is not only an enabler but a co-conspirator.  His girlfriend,
Autumn Dolby, straw purchased weapons for him.  His employee,
Casey McNaughton, straw purchased weapons for him.  Austin
Strotman was helping him straw purchase weapons.  When he's
arrested in Nebraska, he has Casey McNaughton and Autumn Lee
Dolby with him.

Unfortunately, Your Honor, I don't know what type of
regime can be put in place to protect Mr. Freshcorn from
himself or to protect society from Mr. Freshcorn because if
he's in an inpatient facility, unfortunately, he can, while it
would be a violation of his conditions, he can just walk out,
he can leave.  There's nothing keeping him there.
Additionally, there's nothing keeping him with access to these
people.  If he's on home detention with electronic monitoring,
how does that prevent these types of things from occurring when
you have every single person around you enabling you.

Your Honor, if this was a one-time gun possession case

where Mr. Freshcorn is a convicted felon, he gets caught with a
weapon, I think the complexion of this case is completely
different.  We don't have the dangers to the community and the
dangers to himself, but here we have a proclivity for compiling
weapons, dangerous weapons, ammunition, combined with drug use,
and the means to do it, Your Honor, that Mr. Freshcorn has, has
essentially created a deadly combination for himself and others
to put him in the cyclone of access to money, access to
weapons, friends that will help him.  Your Honor, nothing is
going to prevent that, short of incarceration, because of the
history and pattern of Mr. Freshcorn, as well as the very real
nature of what is going to stop Mr. Freshcorn from -- he bought
all these weapons he was not supposed to.  He's told by the
store you can't buy weapons, so you buy a ton of ammunition,
then you get irate to the point where people are upset and
scared of him.  That's very troubling, Your Honor.  So I don't
think there are any combinations or conditions of combinations
that can prevent Mr. Freshcorn from exhibiting this type of
dangerous behavior and putting weapons out on the street for
those uses.

          THE COURT:  Thank you, Mr. Lanni.

          Mr. DeRiso.

          MR. DeRISO:  Thank you, Your Honor.

          The government needs the Court to consider

Mr. Freshcorn being a flight risk, even though they have

presented no evidence of such, and their burden on that is, I believe clear and convincing. So, they need the Court to consider that in order to stomp out the options for the Court to consider, i.e., home electronic monitoring and inpatient --

MR. LANNI: Your Honor, I'll withdraw any mention for risk of flight or anything like that at this point.

THE COURT: Okay.

MR. DeRISO: If that's the case then, that begs the question of him fleeing a condition of house arrest and/or inpatient is nonsensical because he's always been a member of the community. He has always appeared for court. I think there are a couple of occasions, one was a technical matter, I think the other one he was incarcerated at the time and didn't make a Nebraska hearing.

THE COURT: One could argue that we don't want him out buying guns, for example, or heroin.

MR. DeRISO: We don't want anyone buying --

THE COURT: I often put people on electronic monitoring or house arrest because they're a danger to the community.

MR. DeRISO: If Mr. Freshcorn did things to conceal the purchases or did things dangerous with the firearms, or when they went to the house, they were haphazardly loaded and all over the place, I think that would give the government's argument more weight, but here we have somebody who, again,

ignorance of the law is not a defense, however, Mr. Freshcorn

did not -- he freely used his card.  He wasn't trying to hide

his identity, so why he did that might be something we get into

later, but this wasn't a, quote/unquote, straw purchase where

this Court sees I buy a gun with my money and I give it to

Mr. Zunder, I just hand it to him and then report it stolen.

That's often the case.  This is where Mr. Freshcorn was

allegedly in there, used his money, didn't do anything to hide

his identification, and there's evidence that the guns were

being used on his property in a safe manner.  So, I get there's

a concern, being concerned does not equate to a dangerous

person where conditions could not satisfy the Court's concern.

So, I would ask the Court to consider a couple of

conditions.  The other thing is, if you look at his report that

Mr. Lanni extensively went through, there's nothing from 2009

for seven years.  It's stale.  Mr. Freshcorn, obviously,

something triggered him.  Yes, right or wrong, his father's

passing triggered a lot of things in 2017.  Those things need

to be dealt with, so I think Mr. Freshcorn needs a mental

health eval, an inpatient rehab.  And I understand that the

Court protecting society is its first concern, however, I don't

agree with the government that society at large needs protected

from someone who had these firearms and the manner in which

they were kept and purchased.  It wasn't some seedy operation.

They weren't being used to trade for drugs.  They were actually

safely held.  So I would ask the Court to consider those

conditions, Your Honor.

Thank you.

THE COURT:  What about the issue of, I think one of

the things that you were proposing is that once he's out of

drug rehab, that he would go back to this 324 Washington Avenue

address.

MR. DeRISO:  Yes, Your Honor.  If he were to --

THE COURT:  I'm a little concerned because doesn't

Autumn Dolby live there?

MR. DeRISO:  I have been instructed by my client, she

will not be living there by the end of this weekend.  That I

can tell you.  We are okay and Mr. Freshcorn is nodding his

head affirmatively, the Court can impose no contact with

Autumn, with McNaughton, with whoever these alleged straw

purchasers are.  We have no problem with that.  It wasn't done

in the context that it is usually done that is being alleged.

THE COURT:  The mother is the one who lives there?

MR. DeRISO:  Yes, Your Honor.

THE COURT:  This matter comes before the Court on the

request of the government to detain the defendant, Emmett

Freshcorn, pending the trial of this matter.

In considering this request, I am guided by several

principles.  First, at all times, the defendant is entitled to

the presumption of innocence.  Nothing that takes place at the

hearing or that I set forth in my findings is intended or
should be construed to affect that presumption.  Rather, the
purpose of this hearing is to determine whether not
withstanding that presumption of innocence, the defendant
should be detained pending trial.

Second, under the Bail Reform Act, detention is an
exceptional step.  Under the act, a defendant must be released
prior to trial, unless a judicial officer finds that no
conditions or combination of conditions exist which will
reasonably assure the safety of any other person in the
community and assure the appearance of the defendant.

In this case, the government seeks to detain the
defendant under Section 3142(f)(1), I think, or is it (f)(2),
Mr. Lanni?  It's a crime of violence, right, the charge?

MR. LANNI:  It is not, Your Honor.

THE COURT:  It would be (f)(2) then, risk of --

MR. LANNI:  Your Honor, it would just be danger to the
person or community.

THE COURT:  There wasn't anything checked on your
hearing -- you are just saying the government is entitled to a
hearing, but there's nothing --

So it's either going to be a crime of violence as
defined in 18 United States Code 3156.

MR. LANNI:  It is not.

THE COURT:  So then are we looking at the chance that

1 he's a flight risk or a risk of obstruction of justice?

2       MR. LANNI: Your Honor, I think that if we were to

3 have to argue upon these points, that it was possession or use

4 of a firearm or other dangerous weapon, that's what would

5 entitle us to the hearing. That would be subsection (e).

6       THE COURT: 3142(e).

7       MR. LANNI: Defendant is charged with a felony, which

8 is not a crime of violence but involves a minor victim,

9 possession or use of a firearm or destructive device or other

10 dangerous weapon, so I believe that would entitle us to --

11       THE COURT: That entitles you to your hearing?

12       MR. LANNI: Yes.

13       THE COURT: This is not a presumption case, as

14 everyone has agreed. So, I must then turn to the four factors

15 that the Bail Reform Act requires me to consider.

16       The first is the nature and circumstances of the

17 alleged offense.

18       So on the face of it, it's a charge of possession of

19 guns and ammunition by a convicted felon. As Mr. Lanni argued,

20 and showed via testimony, there's a lot more to the story, it's

21 not just a gun, it's a lot of guns, and guns that are indeed

22 very dangerous guns.

23       The second is the weight of the evidence against the

24 defendant.

25       I would find that the evidence is strong that

Mr. Freshcorn did commit the crime as charged.

Third is the history and characteristics.

So, we do have some things, Mr. Freshcorn, while you were younger, a rash of things, actually. And then it seems that in '09, you either stopped or for whatever reason weren't charged. I do have two violations while on parole, which does give me pause, but, again, the more recent one of those was in '09, so that was quite some time ago.

You did have some employment, although it's not indicated in the pretrial report, I think you did work for your father.

THE DEFENDANT: Yes.

THE COURT: At least until he died.

Your family ties, you have a mother here, you have been in the community for quite some time. You do have, though, a history of drug use, including heroin, which is very serious.

I think that the government is withdrawing their risk of flight allegation?

MR. LANNI: Yes, Your Honor.

THE COURT: I would have found there is no flight risk in any event.

The question is, are you a danger to the community when you're released?

All these guns are very scary to me and I think to

everyone here.  There is no evidence that the guns were used in a violent way.  They seem to have been used for target practice and recreational shooting.  When they were around, if I heard the testimony correctly, they were either locked or not loaded, the ones that were found.

It is my impression that all of this was triggered when you started using drugs.  It appears to me that if you are not using drugs, you are not a danger to the community, so because of that, I think that we can impose conditions that would ensure, reasonably ensure the safety of the community, but those will have to be very stringent conditions.  You do have some money, so that's going to play into this.

I am going to release you on some stringent conditions, and I'm going to tell you that if you violate, there will be an arrest warrant and you will be incarcerated, no ifs, ands or buts about that.

I'm going to have you post a $100,000 unsecured bond. So that means you don't have to post bond in order to be released today, but you are binding yourself in that amount should you fail to appear for any future court proceedings.

You will be monitored by Pretrial Services.

You will surrender any passport you may have to Pretrial Services.  You will not obtain any passport or any travel documents.

Your travel is restricted to the Western District of

1 Pennsylvania.

2    You are to avoid all contact, directly or indirectly,

3 so that includes text messaging, phone calls with anyone who

4 is a victim or witness in this investigation.  I am concerned

5 about the people who are alleged to have been with you in

6 buying these guns.

7    You are to get psychiatric treatment.

8    You are not to possess a firearm.

9    You are to avoid the excessive use of alcohol.

10    You are not to use or unlawfully possess any narcotic

11 drugs.  You'll be drug tested.

12    I want you to do a minimum of 30 days of inpatient

13 treatment, and that's going to be at your own expense, and more

14 if pretrial directs that.

15    When you are released, I'm going to put you on home

16 detention with electronic monitoring.

17    You are to report to pretrial any contact that you may

18 have with law enforcement.

19    I'm hopeful that if we do that, that you will be

20 clean, and if you are not using drugs, then you will not buy

21 guns because, look, I know there's a Second Amendment, everyone

22 wants a gun, but you can't have a gun because you have a prior

23 conviction, it is that simple, so you need to find another type

24 of recreation.  I think that if you stop using drugs, that will

25 happen.  Now, if you walk away from this inpatient program, a

1  warrant will be issued and you will be arrested.

2          Do you understand that?

3          THE DEFENDANT:  Yes, Your Honor.

4          THE COURT:  I don't know if we have a bed for you, so

5  we can hold you until we find a wed.

6          MR. BOSSART:  Your Honor, given the defendant has been

7  in custody since mid March and does presumably have achieved

8  some measure of sobriety, we would ask that he be held pending

9  his placement, in other words, he be released directly to that

10  inpatient substance abuse care facility, again, with

11  arrangements to be made by defense with approval of Pretrial

12  Services.

13          THE COURT:  What I'm going do is on the release

14  papers, I'm going to say the marshal is ordered to keep the

15  defendant in custody until notified by the clerk or judge, that

16  the defendant has complied with all other conditions of

17  release.  And I'm going to put in here, obtained placement in a

18  rehab facility approved by Pretrial Services.

19          MR. BOSSART:  Yes, Your Honor.

20          MR. DeRISO:  Your Honor, when we're done with the

21  rehab, I want to switch gears for one second when we're done

22  with that issue before you issue the final order.

23          THE COURT:  Go ahead.

24          MR. DeRISO:  He has a court appearance in Nebraska.  I

25  would ask the Court to allow him to go there without us having

1  to file a motion to travel.

2          THE COURT:  Right.

3          Is that a district or is it just Nebraska?

4          THE DEFENDANT:  Lincoln, Nebraska.

5          THE COURT:  When is that, do you know?

6          MR. DeRISO:  He's supposed to call probation tomorrow,

7  Your Honor.  If he's incarcerated, I'm not sure how we're going

8  to facilitate that, that's not your problem, that's our

9  problem.  I'm not sure.

10          Can you in your order permit him to call his pretrial

11  service in Nebraska?  If you do that, the ACJ will follow that

12  order, his counselor will allow that to happen.

13          THE COURT:  You mean he has to personally call?  Can't

14  one of the lawyers call?

15          MR. DeRISO:  No.  He has to personally call his

16  pretrial/probation.

17          THE COURT:  I don't know.  How do things work at ACJ?

18  They don't usually do what I ask them to do.  Are you allowed

19  to make phone calls there?

20          MR. DeRISO:  Through your counselor, yes.  I have had

21  clients call me, they go through the counselor, and the

22  counselor allows them to make a phone call.  That's the best I

23  can do.

24          THE COURT:  So you're asking me to put that in the

25  order?

1      MR. DeRISO:  I am, Judge.  I'm asking you to direct

2 the ACJ to permit Emmett Freshcorn to call his probation

3 officer in Nebraska.  They have to facilitate it.

4      Can we bring him back over here tomorrow, Judge, and

5 make the call through pretrial?

6      MR. LANNI:  Before we get through all this, I was

7 instructed by my office to ask for a stay of any release order.

8 So, respectfully, I understand your decision, but before we do

9 everything, I would just want to put that on the record, in

10 case that changes any of making of these plans or anything.  We

11 respect your decision, but I was instructed to ask for a stay

12 for one day in order to file a notice of appeal.

13      THE COURT:  Okay.

14      Well, I can't order the Allegheny County Jail to do

15 anything, so I will say the Allegheny County Jail is requested

16 to permit defendant to contact his probation officer in

17 Nebraska.  I don't know if this will help, but I can put it in

18 here.

19      Mr. Lanni, you're going to file by when?

20      MR. LANNI:  I would imagine I would be able to file by

21 the end of the day, but I would ask for a 24-hour stay.

22      If not, then I'll have to have it filed by the end of

23 the day.

24      THE COURT:  It's kind of complicated.  I have a lot of

25 different things written in here.

1        I am saying at the end, this order is stayed pending

2  the filing of an appeal by the United States of America until

3  the end of business on April 4, 2018.

4        MR. LANNI:  Thank you, Your Honor.

5        THE COURT:  If they don't file an appeal below, I have

6  noted the marshal is to keep him in custody until he has

7  obtained placement in a rehab facility approved by pretrial.

8        I want to get this filed so Judge Bissoon knows what I

9  had in mind when she's considering the appeal.

10       So I'm going to have him sign and I'll sign and we'll

11 docket this and then we'll see what happens.

12       MR. DeRISO:  Thank you, Your Honor.

13    (Court adjourned.)

14                        -----

15                      I-N-D-E-X

16
   WITNESS              Direct      Cross     Redirect     Recross
17
   William Isbir          2          22          --          32
18 James Smith           33          36          39          --

19

                        CERTIFICATE

20
       I, Juliann A. Kienzle, certify that the foregoing is a
21 correct transcript from the record of proceedings in the
   above-titled matter.
22

23 s/Juliann A. Kienzle, RMR, CRR
   _____
24 Juliann A. Kienzle, RMR, CRR

25